UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NO. 6:18-17 |
| | § | |
| MIGUEL ANGEL LOZANO-ALVAREZ, | § | |
| Defendant. | § | |

**MEMORANDUM OPINION & ORDER**

Defendant Miguel Angel Lozano-Alvarez is charged with conspiracy to possess with intent to distribute approximately 60 kilograms of a mixture or substance containing a detectable amount of methamphetamine. Now pending is Defendant's Motion to Suppress (D.E. 29), to which the Government responded (D.E. 32). An evidentiary hearing was held, after which Defendant filed a supplemental memorandum (D.E. 45).

**1. Factual Background**

The following evidence was presented at the hearing on Defendant's motion to suppress. *See* 4/29/2019 Hrg. Tr., D.E. 39.

Fayette County Sheriff's Deputy Randy Thumman testified that on February 26, 2018, he pulled over a Chevy Tahoe with Mexican license plates after he observed that the vehicle had an obscured view of the windshield, drove on the improved shoulder, and failed to completely stop at a stop sign. Dash cam video also showed the vehicle was traveling 55 mph while exiting the highway in a 35 mph zone. The Tahoe was driven by Defendant, who was accompanied by Codefendant Alma Rosario Nieto-Villarreal.

Before approaching the Tahoe, Sgt. Thumman called in the license plate to dispatch. Because the vehicle had a Mexican plate, he told dispatch "10-6," which was a directive not to give him a return unless the vehicle was stolen, used in a crime, or had any outstanding ticket

1

warrants. He ran Defendant's license plate himself using an app on his cellphone called Check Auto MX, which provides information on the year, make, model, owner, and registration for Mexican vehicles. He also searched Border Patrol's records on his patrol car computer and learned that Defendant had traveled from Mexico to Houston and back four times since purchasing the Tahoe less than four months prior.

The dash cam showed that Sgt. Thumman approached the vehicle at 2:27 P.M. He did not tell Defendant the reason for the stop, but immediately asked for his license, registration, and insurance card, and began asking questions about his itinerary. Defendant explained that he was headed to Houston to The Galleria and to visit his father. When asked about the duration of the trip, Defendant responded that it was for three days. Sgt. Thumman observed that Defendant was "extremely nervous," his hands were shaking and his carotid artery was visibly pulsating, and "there was something going on that had him a little amped up." He next asked Defendant if his registration was expired, and Defendant said it was not. Defendant attempted to explain in Spanish when Sgt. Thumman told him to speak in English. When asked, Defendant responded that the current trip to Houston in the Tahoe was his second. Sgt. Thumman reentered his patrol car, then returned to the Tahoe and asked if there was anything illegal in the vehicle, like guns or drugs, and Defendant said no. Sgt. Thumman testified that, at the same time they were talking, he was comparing Defendant's license and registration with the information he obtained online to see if anything conflicted.

At 2:31 P.M., Sgt. Thumman asked for consent to search the Tahoe, and Defendant said yes. Defendant and his passenger were then escorted to the side of the road. Sgt. Thumman searched the Tahoe for approximately seven minutes when he observed that the gas tank had been recently manipulated or installed and was "abnormally dense" based on the sound it made—a thud as opposed to a ping—when he tapped on it. This led Sgt. Thumman to conclude

that the tank had a separate compartment that, based on his training and experience, must contain some kind of contraband, likely drugs. He also observed that the vehicle contained no luggage, which he found suspicious given Defendant's stated travel plans.

At 2:40 P.M., Sgt. Thumman handcuffed Defendant and asked him if he had ever been arrested before and what he had in his gas tank. Defendant responded, "No entiendo (I don't understand)." Sgt. Thumman again told Defendant to speak English, and Defendant responded, "I don't understand." Sgt. Thumman then radioed for backup. While waiting for backup to arrive, he brought out his K9 unit, Lobos, and ran him around the Tahoe. Lobos did not alert after conducting a free air sniff. Once backup arrived, Sgt. Thumman began searching under the Tahoe and asked for a scanner in order to see what the suspected drugs looked like inside the compartment and also to train his partner. He then asked his partner to get under the Tahoe and tap on the gas tank, on the bottom, and to look underneath the whole thing. At 2:46 P.M., Sgt. Thumman opened the Tahoe's gas cap and ran Lobos around the vehicle again in order to determine why Lobos didn't alert the first time and also for "training purposes." This time, Lobos alerted near the gas tank.

At 2:52 P.M.—roughly 25 minutes after the stop was initiated—the Tahoe was taken to a mechanic's shop, where Defendant watched in handcuffs as his vehicle was lifted. Sgt. Thumman discovered an aftermarket compartment inside the gas tank. He drilled a small hole in the tank, and liquid methamphetamine leaked out. Sixty kilograms of methamphetamine was ultimately removed from inside the tank.

On February 27, 2018, Defendant was Mirandized in Spanish and agreed to be interviewed by Homeland Security Investigations Special Agent Steven Greenwell and Drug Enforcement Administration Special Agent Wayne Hanie. In a tape recorded interview, Defendant admitted he had been hired by unknown persons in Nuevo Laredo, Mexico, to

3

transport liquid methamphetamine to Houston. He had made two successful trips on prior occasions and would receive $3,000.00 into his bank account for each trip.

## II. Defendant's Motion to Suppress

Defendant moves to suppress evidence of the methamphetamine and any statements he made following his arrest on the grounds that: (1) Sgt. Thumman unlawfully prolonged the stop by asking questions unrelated to any traffic violation; (2) there was no probable cause for Defendant's arrest; (3) Defendant's consent to search was not voluntary or an independent act of free will; and (4) the methamphetamine is fruit of the poisonous tree based on the unlawful search and arrest.[1]

## III. Analysis

### A. Did Sgt. Thumman unlawfully prolong the stop?

In the context of a traffic stop, an officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupant's trip as part of this investigation. *Id.* An officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as the unrelated questions do not extend the duration of the stop. *Id.* However, once an officer's initial suspicions "have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). The Supreme Court has further held that, absent reasonable suspicion, police may not extend an otherwise-completed traffic stop, in which a ticket or warning has been issued, in order to conduct an unrelated search. *Rodriguez v. United*

---

1. Defendant's original motion to suppress also argued that he did not violate any traffic laws in order to justify the stop and that K9 Lobos was either trained in a manner that would not allow the Court to objectively determine that he made an alert, or he did not in fact alert. However, Defendant conceded in his post-hearing memorandum that the stop was justified and K9 Lobos did alert to the gas tank.

*States*, — U.S. —, 135 S.Ct. 1609, 1616 (2015) (dog sniff performed after officer issued written warning for traffic violation held unlawful).

Defendant complains that, before Sgt. Thumman asked for consent to search, he failed to diligently investigate the reason for the initial stop or whether Defendant had any outstanding warrants, a lack of or lapse in insurance, or vehicle registration/ownership issues with the Tahoe. Instead, Sgt. Thumman detained Defendant beyond the time needed to investigate the circumstances that caused the stop and in a manner that did not utilize the diligence required by *Terry*. Defendant maintains that, because of Sgt. Thumman's 10-6 order, there was no routine computer check by dispatch to be processed, and therefore no additional time to ask any questions not related to the traffic stop or engage in any other investigation.

The record shows that Sgt. Thumman determined almost immediately after the stop that Defendant's registration was expired, which is an arrestable offense in Texas.[2] Despite the 10-6, he was free to inquire about the purpose and itinerary of Defendant's trip without unlawfully extending the stop, because the Fifth Circuit "consider[s] these questions to be reasonably related in scope to his investigation of the circumstances that caused the stop." *Pack*, 612 F.3d at 350. During this conversation, Sgt. Thumman developed additional reasonable suspicion of illegal activity based on Defendant's extreme nervousness and seemingly false statement about his recent travel history between Mexico and Houston. *See United States v. Berry*, 664 F. App'x 413, 419 (5th Cir. 2016), *as revised* (Dec. 14, 2016) (unpublished) ("[I]nconsistent and untruthful statements can be a factor in developing reasonable suspicion during a traffic stop . . .

---

2. Defendant argues that the Check Auto MX is unreliable and not an approved law enforcement tool. Sgt. Thumman testified that the app was recommended by a colleague with Border Patrol, but he did not seek approval from the Fayette County Sheriff's Office to use it. He further testified that he never used the app in order to establish probable cause to stop a vehicle or make an arrest, but instead compares the information from the app with the information he gets when he approaches a vehicle. SA Greenwell testified that it is common practice for law enforcement to use such public databases to ascertain whatever information they can, even though they would not use this information in a court document or affidavit. In this case, Sgt. Thumman did not use the information from the Check Auto MX app to arrest Defendant for his expired registration, but it did justify extending the stop to further question Defendant.

5

as can an individual's nervous behavior during that stop."). Within four minutes after initiating the stop, Sgt. Thumman conducted this colloquy and received consent to search Defendant's vehicle. During the next seven minutes, he observed that Defendant had no luggage in the vehicle, observed the gas tank had been recently installed and was abnormally dense, developed a belief that the gas tank contained a hidden compartment that likely contained contraband, and directly asked Defendant about the contents of the gas tank.

On this record, the Court finds Sgt. Thumman had "developed reasonable suspicion of additional criminal activity" to justify extending the stop to investigate additional criminal activity. *See, e.g.*, *Berry*, 664 F. App'x at 419 (reasonable suspicion to extend stop where motorist appeared nervous, trooper believed motorist lied during traffic stop, and he was not wearing clothes suitable for construction work); *United States v. Hipolito-Ramirez*, 657 F. App'x 271, 273 (5th Cir. 2016) (unpublished) (reasonable suspicion established by defendant's nervousness, his implausible story, and his travel on a known drug corridor); *Pack*, 612 F.3d at 358–61 (5th Cir. 2010) (reasonable suspicion was created by defendant's extreme nervousness, conflicting story, and the fact that he was traveling along a drug trafficking corridor); *United States v. Garza*, 2009 WL 10680036, at *4 (W.D. Tex. Nov. 19, 2009), *aff'd*, 452 F. App'x 510 (5th Cir. 2011) (reasonable suspicion of narcotics trafficking warranted further detention and questioning where defendant was "visibly nervous with shaking hands, and responded suspiciously to the officers' questions. . . . .[A]nd despite being away from home for days, he carried no luggage."). The Court further finds the detention was not longer than necessary to investigate the circumstances justifying the stop.

**B. Was Defendant unlawfully arrested?**

Defendant argues that Sgt. Thumman did not have probable cause to believe that he possessed drugs in the gas tank after tapping it, and to handcuff and arrest him, accordingly.

6

Defendant further argues that Sgt. Thumman was a "self-taught, gas tank tapper" with no training or experience in finding drugs in modified gas tank compartments.

Sgt. Thumman testified that he had personally found modified gas tank compartments on 12-15 occasions, but he had seen such compartments hundreds of times in briefings, as this tactic is a common way to smuggle contraband across the border and through checkpoints. In his experience, the only thing he had discovered in a loaded gas tank going northbound was drugs. He further stated he took an interdiction course the previous year, during which gas tank density was discussed.

Sgt. Thumman also testified that Defendant was not under arrest when he was initially handcuffed, but merely being detained on suspicion of narcotics trafficking until Sgt. Thumman could get into the Tahoe's gas tank and confirm exactly what it contained. He merely asked Defendant if he had ever been arrested before as part of his investigation and for officer safety, and not because he was telling Defendant he was under arrest. It was not until they got to the mechanic's shop, dropped the gas tank, and tested the substance inside that he arrested Defendant for what he specifically knew was in the tank.

The Court finds that Defendant was not under arrest at the time he was placed in handcuffs. However, even if he were, "under the law of this circuit, evidence of a hidden compartment [in a vehicle] supports 'probable cause' for a search/arrest." *United States v. Estrada*, 459 F.3d 627, 633 (5th Cir. 2006). Thus, any arrest after Sgt. Thumman discovered the hidden compartment in the Tahoe's gas tank and Lobos alerted to the presence of drugs would have been lawful.

**C. Was Defendant's consent to search valid?**

Defendant argues that he did not voluntarily consent to the search of his vehicle, and his consent was not an act of free will. If a challenge is made to the voluntariness of consent to

search, the Government must prove voluntariness by a preponderance of the evidence. *United States v. Arias-Robles*, 477 F.3d 245, 248 (5th Cir. 2007); *United States v. Santiago*, 410 F.3d 193 (5th Cir. 2005). The voluntariness of consent is a "question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). In its review based on the totality of the circumstances, the Court should consider six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *Santiago*, 410 F.3d at 199; *see also Arias-Robles*, 477 F.3d at 248. Although all factors are relevant, none is dispositive. *Santiago*, 410 F.3d at 199; *see also United States v. Hernandez,* 279 F.3d 302 (5th Cir. 2002).

  1. **Voluntariness of custodial status**

Defendant was not in custody at the time he gave consent, but was sitting in the front seat of his own vehicle.

  2. **Presence of coercive police procedures**

There was no evidence presented of any coercive police procedures during the encounter.

  3. **Extent and level of cooperation**

Throughout the traffic stop, Defendant cooperated with Sgt. Thumman and never showed any resistance.

  4. **Awareness of the right to refuse consent**

Defendant complains that Sgt. Thumman never informed him that he had the right to refuse consent, and, once he was handcuffed, he was forced to realize that he had no right to revoke his consent to the search and/or limit its scope. Defendant further states that he did not

consent to having Sgt. Thumman transport his Tahoe to a mechanic's shop, drop the gas tank, and drill through the tank.

While Sgt. Thumman never informed Defendant of his right to refuse, an officer is not required to advise a suspect of their right to refuse consent to a search for the consent to be voluntary. *Schneckloth*, 412 U.S. at 231; *see also United States v. Gonzalez-Garcia*, 708 F.3d 682, 686 (5th Cir. 2013). Regarding the scope of consent, the Fifth Circuit has held that a defendant's "failure to object to the breadth of the search is properly considered 'an indication that the search was within the scope of the initial consent.'" *United States v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995) (quoting *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994)). As the Fifth Circuit explained, "the defendant, as the 'individual knowing the contents of the vehicle,' has the 'responsibility to limit the scope of the consent.'" *Id.* (quoting *United States v. Rich*, 992 F.2d 502, 507 (5th Cir. 1993). "Because [Defendant] knew at the time of the search what the [fuel tank] hid, he should have limited his consent, 'if he deemed it necessary to do so,' *id.*, to clarify any ambiguity from which he now seeks to benefit." *See id.*

Moreover, once Sgt. Thumman discovered the hidden compartment in the Tahoe's gas tank, he had probable cause for a search and no longer needed Defendant's consent. *See Estrada*, 459 F.3d at 633; *United States v. Inocencio*, 40 F.3d 716, 724 (5th Cir. 1994) (evidence of false compartment contributed to probable cause for search); *United States v. Price*, 869 F.2d 801, 804 (5th Cir. 1989) ("Once the agents had discovered the secret compartment they had probable cause to search the compartment itself."). K9 Lobos' alert to the presence of drugs in the gas tank also furnished probable cause to search the gas tank without a warrant or consent. *See United States v. Sanchez-Pena*, 336 F.3d 431, 444 (5th Cir. 2003) ("We have repeatedly affirmed that an alert by a drug-detecting dog provides probable cause to search."). Thus, even if Defendant had attempted to revoke his consent after he was handcuffed, Sgt. Thumman would

9

have been justified in continuing his search, including lifting the Tahoe and drilling into the gas tank.

### 5. Education and intelligence

Defendant, a Mexican national, claims he is not a sophisticated man and that his limited ability to speak English supports a finding of involuntariness on this factor. Defendant complains that, when he attempted to speak Spanish in response to some of Sgt. Thumman's questions, he was repeatedly told to speak English. The Government responds that Defendant was perfectly capable of speaking English when it suited him, and he only struggled with the English language when asked direct questions with clear criminal consequences, *i.e.* why his car registration was expired, what he had hidden in his gas tank, etc.

Homeland Security Special Agent Carl Eugene Marshall testified at the hearing that, during the two-hour drive in which he transported Defendant from the Fayette County Sheriff's Office to the Coastal Bend Detention Center, he and Defendant spoke in both Spanish and English, but predominantly in English. SA Agent Greenwell similarly testified that when he interviewed Defendant, they spoke predominantly in English. A review of the taped interview showed that Defendant could understand and communicate in English. Defendant also concedes that he has some college education.

### 6. Belief that no incriminating evidence will be found

The methamphetamine was hidden in a custom-built compartment within the vehicle's fuel tank that required a mechanic with special tools to access; thus, Defendant argues that did not expect the methamphetamine to be found.

Based on the totality of circumstances, the Court finds Defendant's consent to search was voluntary.

**D. Are the methamphetamine and confession "fruit of the poisonous tree"?**

Finally, Defendant argues that, because his arrest and the search of his vehicle were unlawful, the methamphetamine and his subsequent confession must be suppressed as "fruit of the poisonous tree." Under this doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation. *Brown v. Illinois*, 422 U.S. 590, 602, 604 (1975); *Wong Sun v. United States*, 371 U.S. 471, 484, 488 (1963). As set forth *supra*, Defendant was not illegally arrested, the search of his vehicle was lawful, and he was properly Mirandized before he was questioned. Thus, the methamphetamine and Defendant's confession are admissible.

**IV. Conclusion**

For the foregoing reasons, Defendant's Motion to Suppress (D.E. 29) is **DENIED**.

It is so **ORDERED** this 18th day of December, 2019.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE